## LYON, ET AL. V. HUNT, ET AL.

1. The bill charges with particularity, that L. who is insolvent, claims certain lands as the purchaser at an irregular sale of a tax collector, whose deed he has, that L. was threatening to commit trespasses and waste on the premises, that himself and others, acting avowedly under his authority, are making preparations with a view to their commission, that the complainants have been disturbed in the enjoyment of their property, and are likely to be more seriously interrupted: *Further*, that the complainants are thus prevented from making the profit from their estate which otherwise they would, and its value in market is lessened. *Held*, that it was competent for chancery in such a case, to grant an injunction to stay the commission of trespass and waste; that as the deed threw a cloud over complainants' title, that court might remove the cloud, and direct the cancellation of the deed; especially where the deed, in point of form, was *prima facie valid.*

2. To sustain the title of a purchaser of land under a sale by the collector for the non-payment of taxes, it is necessary for him to show *affirmatively*, that every substantial requisite of the law has been complied with; consequently he must prove that advertisement of the time and place of sale by the collector, was made for the length of time directed by the statute; that the land proposed to be sold was so particularized in the advertisement as to be susceptible of identification, &c. &c.

3. Where a bill charges that the defendant, or a person under whom he claims, failed to perform some legal act, indispensable to the validity of his title, in a manner conformable to law, an affirmation by the defendant in his answer, that the act was regularly performed, without stating with particularity the mode of performance, is not such a denial as requires the testimony of two witnesses, or one witness, and strong circumstances to overbalance it.

Error to the Court of Chancery sitting in Mobile.

THE defendants in error, who are some ten or fifteen individuals, and four corporations or their assignees, filed their bill, setting forth that the Orange or Poplar Grove tract of land in the city of Mobile, which originally contained about two hundred and sixty-three acres, was in the spring of 1835, conveyed by its then proprietors to Thomas W. McCoy, James Magee and Calvin Norris in trust. These trustees entered upon the land in virtue of the deed, and became seized and possessed thereof, for the purposes therein specified.

The complainants alledge, that they are, as tenants in common, interested in so much of the land referred to, as remains in the hands of the trustees unsold, and their title is recognized by each other. Being in quiet enjoyment of the premises, their possession was disturbed by James G. Lyon, George Huggins, and Ulysses T. Cleveland. The disturbance by Lyon was made public by an advertisement contained in the papers of the city of Mobile, one of which is subjoined, and prayed to be taken as a part of the bill. Complainants believe, that the possession referred to in the advertisement is predicated of some act recently done by Huggins, who was the sheriff of Mobile county, from the three years preceding up to August, 1843 ; that the possession was nothing more than going on the land, making a claim to it, warning people not to touch it. But preparations are being made to place tenants in possession, to commit waste by the removal of earth, and digging and selling dirt—thus ousting the complainants :. *Further*, men and carts have been employed and arrayed for that purpose, but the complainants have not been otherwise disturbed except by threats and interference with their lawful control, preventing the community from purchasing dirt and materials upon the land, and otherwise hindering the profitable use of the same.

Complainants charge that Lyon is insolvent, so that an action at law for damages would be unavailing against him. They alledge that the proceedings on the part of Lyon are the result of the illegal conduct of the sheriff. In 1841, Huggins being sheriff of Mobile county, assessed certain lands, described as *the balance of the Orange Grove tract remaining unsold to McCoy, Norris, and Magee, trustees.* *Tax,* $175 50. That this land was for the first time advertised

for sale under the description here given in the Mobile Daily Advertiser and Chronicle, on the 7th January, 1842, by Geo. Huggins, for the non-payment of taxes—stating that it would be sold on the 7th February next following.  At the sale of this land, complainants have been informed that Lyon became the purchaser, but upon what terms they are wholly ignorant.

It is further stated, that some of the complainants whose names are mentioned, who represented interests in the lands in question, equal to forty-two of the forty-eight shares therein, paid their taxes, on the same, to George Huggins, for the year 1841, and sufficiently described the lands to him to have enabled him to understand to which their payments should be applied.

The trustees, Magee, Norris, and McCoy, resided in Mobile during the years 1841 and 1842, and each of them had personal property more than sufficient to pay the taxes on the premises in question, and upon the service of any warrant upon them would have paid the debt.  Some of the complainants, (who are particularly mentioned,) resided in Mobile, and had a sufficiency of personal property there, to pay the taxes assessed; but the sheriff made no effort to collect the same of the trustees, or their *cestuis que trust*, by levy or distress, on their personal property : *Further*, that no other notice of the sale, or description of the property was given than is contained in the advertisement referred to.

Under the proceedings above recited, it is alledged that the defendants are acting, that the deed from Huggins to Lyon, " recites a variety of particulars, and does not describe the land according to the assessment or advertisement," constitutes a cloud upon the complainants' title, and is calculated to impair the beneficial enjoyment of their estate.

It is also stated that the trust under the deed to Magee, Norris, and McCoy, has expired, and the trustees refuse to interfere for the security or protection of the lands in any way; but they have not reconveyed, and the interest of several of the complainants have been acquired since the expiration of the trust.

The bill prays that Lyon, Huggins, and Cleveland, may

38

answer the same, that they may be enjoined from any entry upon, or interference with the property in question ; that they may abstain from all molestation of the complainants under any pretence whatever, so that they be quieted in their possession from any claim arising out of the illegal proceedings of the defendants ; that the sale by Huggins be annulled, and such other relief be granted as is consistent with equity.

The defendant, Lyon, in his answer, admits that a conveyance was made to McCoy, Magee, and Norris, in 1835, of the lands in question, as trustees, as stated in the bill, and alledges that on the 7th February, 1842, the title to the same was transferred and conveyed to him by George Huggins, then sheriff of Mobile county ; and attaches to his answer a copy of his deed, which he prays may be taken as a part thereof. That previous to its execution, the land was duly advertised for sale, and pursuant thereto was publicly and fairly offered at the court house door, when he, respondent, being the highest bidder, became the purchaser, and paid the purchase money—all which he shall be able to prove when called on in a court of law to do so.

On the 21st August, 1844, Huggins did put respondent into possession of that part of the Orange or Poplar Grove tract, of which he was the purchaser, as shown by a paper attached to the answer, and prayed to be taken as a part thereof.

Respondent does not know what personal estate McCoy, Magee, and Norris had, at the time of the assessment and sale of the land to him, but is informed, and believes, that the two former were insolvent, and that the latter did not then reside in Mobile : Further, he has been informed, and believes, that they had no personal estate of the complainants in their hands, at the time of the sale, with which to pay the county, school, and road tax on the land ; and it must be presumed, that the sheriff, in selling it, did his duty.

The respondent admits his inability to pay his debts, but declares he is ready, willing and able, if necessary, to give bond, with good security, to protect, or reimburse the complainants for any damage he may do, or cause to be done, to the land in question, provided the complainants recover the

same by due course of law. He is ignorant of the existence of any receipts for the taxes due on this land in 1841, and if there be such, Huggins was not informed of it.

Respondent denies, in general terms, every other allegation in the bill, not specifically answered, and requires the complainants to prove the same.

Huggins answers that he is ignorant of the matters stated in the bill, in respect to the title to the premises in question; but states, that in 1841, he was sheriff of Mobile county, and that the taxes remained unpaid upon a portion of the tract of land described in the complainant's bill for that year. These taxes were assessed to McCoy, Magee, and Norris, trustees, &c., and in virtue of the law in such cases, the respondent caused that part of the land on which the taxes were unpaid, to be advertised, for the time, and in the manner, required, in the Mobile Daily Advertiser, for sale, on the 7th February, 1842. On that day it was offered, with other property, to pay the road, county, and school taxes, assessed thereon—many persons were present, and the part so offered was struck off to James G. Lyon, who was the highest bidder, for the sum of $199 77. This sum was paid by the purchaser, and a deed in due form executed and delivered to him by respondent, who, on the 19th August, 1844, placed him in possession.

Respondent does not know, or believe, that McCoy, Magee, and Norris, had in their possession any personal property, belonging to the persons for whom they held the lands in question as trustees, from which the taxes could have been made. That such personal property never was pointed out to him, nor did any one else ever offer to pay these taxes to him. After the advertisement was published, and previous to the sale of the land, respondent informed Sydney Smith, who was the agent for Jonathan Hunt and others, proprietors of the Orange or Poplar Grove tract, that the taxes were unpaid, and if they were not paid, the land described in the deed to Lyon would be sold for their payment. To which Smith replied, that the assignees were the proper persons to pay the tax, and as some of the proprietors had been negligent in paying their proportions, he wished a sale to take place, that their punctuality might be enforced: *Further*,

that the advertising and selling was with the full knowledge and consent of Smith.

As to all other matters alledged, respondent denies all knowledge or participation, or any knowledge of the acts of his co-defendants, save as already stated.

Cleveland answers, that he never had any claim or title to the premises in question, and never pretended to have any interest in the same.   In August, 1844, his co-defendant, Lyon, requested him to see that no person trespassed thereon, and if any one was detected, to give information thereof. He denies that he ever detected any one in the commission of such a trespass, or attempted to prevent any one from going on the land, and doing whatever they pleased there ; he assumed no management or control over it, and as soon as he ascertained that Lyon's title was disputed, he informed him that he could not consent to act as his agent, and never acted, or pretended to act as such.

It was proved on the part of the complainants, that they were in possession, that Lyon placed Cleveland on the land to control it, and prohibited a person who was at work on the premises by authority, from exercising any control there, and brought a suit against him : *Further*, that he made publication in one or two city papers, that he claimed the land by a certain deed, and prohibited all trespasses, &c.   Lyon is reputed insolvent.

The dirt excavated was worth eight or ten cents a cubic yard, and unless removed so as to preserve a level, and with reference to the streets, would seriously injure the property.

The trustees don't act, or interfere with the property, except when they are called on, as by the terms of the trust they are required.   The terms of the trust are considered to be terminated, and they would not act if now called on. Each of them in 1841, '42 and '43, had personal property in Mobile, from which three hundred dollars could have been made by levy.

The sale was advertised by Huggins as collector, in the city paper, from 7th January to 7th February, 1842, stating that the balance of the Orange Grove tract unsold, was assess-

ed to McCoy, Norris, and Magee, trustees, and that the tax amounted to $175 50.

S. Smith testifies, that he paid previous to the day of sale, the taxes of 1841, upon twenty-three of the forty-eight shares of the Orange Grove tract, and has the receipts of George Huggins, by John Pollard, who was deputed and acted as collector of taxes.

H. Barney states, that he paid the tax upon 1-48 to Huggins, for Bacon, Symington and Roberts. S. P. Bullard testifies, that John Bloodgood paid the tax on 4-48 for himself, and 2-48 for Henry Bright. James Hagan proves, that James Magee paid the tax on 4½-48, and John Hagan on 5¾-48. Bright's taxes were paid to John Pollard.

The Chancellor was of opinion that the bill was not wanting in equity—that the sale being made after all, or the greater part of the taxes had been paid, and when the trustees to whom the premises had been assessed, had property of which a collection could have been made, the purchaser acquired no title. That relief should be granted to remove the cloud cast upon the complainants' title, and quieting them in their possession—preventing further disturbance, impending waste, and the effect of the wrongful act of the public officer: *Further*, to prevent irreparable injury from multiplicity of suits. To sustain this conclusion, he cited 1 Baldw. Rep. 205-232; 3 How. R. 441.

It was proposed by the chancellor, to stay proceedings until the defendant, Lyon, should institute an ejectment, and try his title at law. But he declined to accept this proposition ; whereupon it was adjudged that the injunction be perpetuated, and the sale and conveyance under which Lyon claims be set aside, and the defendant pay the costs.

A. F. HOPKINS, for the plaintiffs in error, insisted, that as it was not alledged in the bill that Lyon put Cleveland in possession of the premises, and brought an action of trespass against a tenant of the complainant, it was not admissible to prove these facts. [1 Ala. Rep. 330; 3 Johns. Rep. 566; 6 Id. 543; 14 Id. 507.]

The allegations against Cleveland are denied by his answer, and there is no testimony to disprove the denial.

Smith's evidence does not agree with the allegation in the bill, and if it did, could not overbalance the answer. [3 Por. Rep. 473; 1 Ala. Rep. 330.]

Huggins answers, that the taxes were assessed to the three trustees of the complainant—that they had not sufficient personal property within his knowledge to pay them; that he applied to Smith, who seemed to be complainant's agent for payment, which he declined—expressing a wish that the property might be sold. Respondent accordingly sold and conveyed the land in question to the defendant, Lyon. This answer is not denied by Smith's deposition. The effect of this conveyance under the statute is to vest a good title in the purchaser; and the deed is conclusive evidence that the collector did what the law requires before the sale was made. If the facts concluded by the deed were false, the collector is liable to an action for damages at the suit of a party aggrieved. [Clay's Dig. 566, 567; 18 Johns. R. 441; 3 How. Rep. U. S. 462.] But if the deed is not conclusive as to the regularity of the collector's proceedings and the right to sell, it is at least *prima facie* evidence, and must be overbalanced by proof.

It is alledged in the bill that all the taxes upon the land but six forty-eighths had been paid. The State then had the right to sell for the non-payment of the residue, unless the possession of the trustees of a sufficiency of personal property to pay prevented the exercise of such a right. The collector denies that he knew of such property, and there is no evidence that he possessed such knowledge. The bill alledges that the trustees had ceased to be such, and they were of course not bound to pay the taxes, but does not charge that the collector had notice either actual or constructive of the termination of the trust; these trustees were then not bound to pay the taxes. Who were the owners of the six forty eighths of the land is not stated, nor does it appear what was the value of their personal property. Upon the admission that part of the taxes was unpaid, Lyon was jointly interested in the land with the complainants—the bill therefore has no equity, and should have been dismissed.

The proof shows the payment on less than forty-two of the forty-eight shares, and a part of this was paid to Pollard,

*not Huggins, the collector.* Smith testifies that Pollard was deputed and acted as collector in 1841; but does not state that he was deputed by Huggins, to whom the bill alledges the payment was made. The proof then does not support the allegation. [3 Port. Rep. 483; 2 Ala. Rep. 330; Gresley's Eq. Ev. 9, 10; 3 Johns. Rep. 566; 6 Id. 543; 14 Id. 501.] Bloodgood's payments are stated to have been made to Huggins—Hagan's deposition is too vague to prove any thing, and Barney proves that he paid the tax on one share to Huggins. As no payment is proved by more than one witness to have been made to Huggins, it cannot outweigh his answer.

The witnesses state that they took receipts for the payments they made of taxes, yet these receipts do not accompany the depositions—in their absence the evidence is insufficient. [3 Johns. Rep. 566; 6 Id. 543; 14 Id. 501.] According to the admissions in the bill, the taxes on six shares were not paid—by Lyon's purchase he became the proprietor of these, and could not be excluded from all participation in the enjoyment of the land, as by the decree he is.

In any view, the case is one of a disputed legal right, and equity should not interfere. [6 Ves. Rep. 51; 8 Id. 90; 1 Johns. Ch. Rep. 318; 6 Id. 500; 12 Ohio Rep. 387.] The bill states, and the evidence shows that complainants are in possession, but does not show that either of the defendants committed, or threatened to commit a trespass. If Lyon had committed one trespass and threatened to commit another, the most a court of equity could do, if he was insolvent and a suit at law was brought against him, would be to enjoin the exercise of acts of ownership over the land until a trial at law and the further order of the court.

Sheriffs were made collectors of taxes by a statute passed in 1836. They are agents of the State and counties, and not authorized by the act to delegate their authority. The deputy of a sheriff, in virtue of his appointment as such, is not authorized to collect taxes. [7 Ala. Rep. 100.]

J. A. CAMPBELL, for the defendant, contended that the. equity of the bill rested upon well established principles; that it charged acts done, continued and threatened, which

interfered with the complainants' enjoyment of their property, and which showed that the defendant, Lyon, had attempted to exercise rights and an authority far beyond what he is entitled to by law. [4 Mylne & C. Rep. 249.]

When a bill alledges a fact which must be within the defendant's knowledge, he should respond to it directly—if the answer is equivocal, the allegation will be taken as true. [1 Port. Rep. 257; 7 Ala. Rep. 217; 2 A. K. Marsh. Rep. 4, 6; 2 Dana's Rep. 103.] The defendant, Lyon, admits the plaintiff's title, his possession and disturbance, though he does not answer as to circumstances. [3 Paige's Rep. 606.] He admits his insolvency, and the acts of the sheriff, Huggins— the evidence supplies the only other fact that is controverted, viz., the payment of the taxes.

In addition to the ground of equity already stated, the bill discloses others. Insolvency authorizes equitable interposition, when it would not be otherwise granted. [3 Bro. Ch. Rep. 620, 622; 3 Paige's Rep. 213.] So, where there is an effort to deprive one of his freehold under color of legal authority. [Coop. Rep. 77; 1 Swanst. Rep. 250; 7 Johns. Ch. Rep. 315; 6 Paige's Rep. 88; 16 Pick. Rep. 512; Bald. C. C. Rep. 205; 3 How. Rep. U. S. 441.]

The defendant, Lyon, is not charged with a single trespass, but with the destruction of the complainants' property and their exclusion from its enjoyment by repeated acts. This itself authorizes the interposition of the court by injunction. [9 Wheaton's Reports, 842; 5 Pet. Reports, 1, 20, 78; 1 Vesey, Sr's. Reports, 188; 6 Johns. Chanc. Rep. 501.] And it is not necessary to await the commission of the wrong, but equity may be applied to, and a threatened wrong arrested. [2 Atk. Rep. 182; Baldw. C. C. Rep. 232.]

The taxes on forty-two of the forty-eight shares, it is proved were paid. There was no effort to obtain the residue from the trustees; Huggins' answer admits this. These facts are developed by evidence extrinsic of the conveyance under which the defendant, Lyon, claims, and can only be elicited in chancery. The sheriff's deed throws a cloud over the complainants' title, which that court may be called on to remove. [7 Ves. Rep. 16; 13 Id. 581; 17 Id. 111; 6 Paige's Rep. 262; 3 How. Rep. U. S. 441.]

An averment in a bill need only be made according to the legal effect of the evidence by which it is proposed to sustain it. Thus, if a payment was made to an agent, it is enough to charge that the money was received by the principal himself, for such is the legal effect of the payment to the agent.

The chancellor offered to Lyon a trial at law, which he declined accepting, and he cannot now complain that the complainants have not sued him for the trespass.

The answer of Huggins, that Smith desired the sale to be made, is irresponsive to any allegation, unsupported by any evidence, and need not have been disproved. The sale of any portion was without authority, the illegal acts complained of, affect the estate of all the parties, and the disturbance injures the right of all. As the complainants have a common right of enjoyment which has been disturbed, they may well unite in the prosecution of a suit for its protection. [5 Por. R. 43; 4 Cranch's Rep. 403; 6 Wheat. Rep. 119.]

The decisions in New York as to the effect of a tax collector's deed are inapplicable here; for in that State there is a statute which makes such a deed conclusive evidence. [1 Rev. Stat. N. Y. 411, 412.]

COLLIER, C. J.—The interference of courts of equity in restraint of waste was originally confined to cases founded in priority of title; but at present, the jurisdiction has been enlarged to reach cases of adverse claims and rights not founded in priority; as, for instance, to cases of trespass, attended with irreparable mischief. [2 Story's Eq. 200.] The interposition by way of injunction in cases of waste, may be referred to the broadest principles of social justice. It is exerted where the remedy at law is imperfect, or is wholly denied; where the nature of the injury is such, that a preventive remedy is indispensable, and should be permanent. [Ib.] Even in cases of tenants in common, courts of equity will interfere where the party committing the waste is insolvent; or where the waste is destructive of the estate, and not within the usual legitimate exercise of the right of enjoying it. [Id. 199.] In some cases, the jurisdiction is maintained in order to prevent multiplicity of suits. [1 Story's Eq. 82,

39

491 to 493. See further as to the remedy in equity, 1 Hen. & M. Rep. 18; 1 Monr. Rep. 65.] An injunction to stay waste, it has been decided, will be granted, though there be no suit pending in a court of law, and though no action can be maintained at law against the tenant. [1 Johns. Chancery Rep. 11.]

In Livingston v. Livingston, 6 Johns. Ch. Rep. 497, it was said, that "*Lord Eldon* suggested the propriety, of extending the injunction to trespasses as well as waste, on the ground of preventing irreparable mischief, and the destruction of the substance of the inheritance. The distinction on this point, which was carefully kept up by *Lord Hardwicke*, was shaken by *Lord Thurlow*, in Flamany's case respecting a mine, and seems to be almost broken down and disregarded by *Lord Eldon*. This protection is now granted in the case of timber, coals, lead ore, quarries, &c.; and 'the present established course,' as he observed in Thomas v. Oakley, 18 Ves. 184, 'was to sustain the bill for the purpose of an injunction, connecting it with the account in both cases, and not to put the plaintiff to come here for an injunction, and to go to law for damages." So in Field v. Beaumont, 1 Swa. Rep. 208, the Lord Chancellor remarked that his "court was now in the habit of granting injunctions in cases of trespass, as well as of waste." But is said not to be the general rule that an injunction will lie in a marked case of trespass, where there is no legal remedy for the intrusion. There must be something particular in the case, so as to bring the injury under the head of quieting the possession, or to make out a case of irreparable mischief, or where the value of the inheritance is put in jeopardy. [1 Madd. Ch. Rep. 150.] Where this appears, the jurisdiction of equity is defensible. [6 Joh. Ch. Rep. 497; 1 Paige's Rep. 99; 6 Ves. Rep. 147; 7 Id. 305; 10 Id. 290; 15 Id. 138; 16 Id. 128; 17 Id. 110, 128, 281.]

In Hart & Hoyt v. Mayor, &c. of Albany, 3 Paige's Rep. 213, the chancellor observed that the cases in which his court had interfered to prevent a mere trespass, have been those in which the complainant had been in the previous undisturbed enjoyment of the property under claim of right, or where from the irresponsibility of the defendant, or otherwise, the

complainant could not obtain relief at law.    And in the M. & H. Railroad Co. v. Artcher, 6 Paige's Rep. 88, it was asserted that chancery has an undoubted right to interfere by injunction where public officers are proceeding illegally and improperly under a claim of right, or where the exercise of such a jurisdiction is necessary to prevent a multiplicity of suits at, law; and this, although the complainants might have lain by and permitted the defendants to proceed, and then have sued them at law to recover satisfaction for the injury.    This principle is re-affirmed in Oakley v. Trustees of Williamsburgh, Id. 264-5.    In that case, assessments were made upon certain town lots of the complainant for the expenses of the proceedings to alter the gradations of the streets, and the court was of opinion, that although they might be so far void as not to affect their legal title to the lots, yet as they would of themselves be a cloud upon that title, and must necessarily diminish the value, an injunction should be granted to restrain the defendants from proceeding with the proposed alteration of the former gradation of the street as originally established.    It was added, that as chancery sometimes exercises its jurisdiction for the purpose of removing a cloud from the complainant's title to real estate, it may also in a proper case, interpose its authority to prevent the illegal act from which such a cloud must necessarily arise.

In Pettit v. Shepherd, 5 Paige's Rep. 501, it was held that an injunction will be granted at the suit of the true owner of land to restrain the sale of it, under an execution against the lands and tenements of a third person.    "The jurisdiction of this court," said the chancellor, "to set aside deeds and other legal instruments, which are a cloud upon the title to real estate, and to order them to be delivered up and canceled, appears to be now fully established.    [See Ward v. Ward, 2 Hayw. Rep. 226 ; Leigh v. Everhart's Ex'rs, 4 Mon. Rep. 380 ; Hamilton v. Cummins, 1 Johns. Ch. Rep. 517; Apthorp v. Comstock, 2 Paige's Rep. 482 ; Grover v. Hugell, 3 Russ. Ch. Rep. 432.]    And if a court of chancery would have jurisdiction to set aside the sheriff's deed which might be given on a sale, and to order the same to be delivered up and canceled, as forming an improper cloud upon the complainant's title to his farm, it seems to follow as a necessary

consequence, that the court may interpose its aid to prevent such a shade from being cast upon the title, when the defendant evinces a fixed determination to proceed with the sale." *Lord Eldon*, in Hayward v. Dimsdale, 17 Ves. Rep. 111, declared his opinion that there is a jurisdiction in equity to order a deed forming a cloud upon the title to be delivered up, though that deed is void at law; but he admitted that the contrary had been held by *Lord Thurlow*, and *Lord Loughborough* had held the contrary in 3 Brown's Chan. Rep. 12, and in 1 Ves. Jr. Rep. 50. The same doctrine is maintained in Jackman v. Mitchell, 13 Ves. Rep. 581, and Carroll v. Safford, 3 How. Rep. U. S. 463. The jurisdiction exercised in such cases, says Mr. Justice Story, is founded upon the administration of a protective or preventive justice. The party is relieved upon the principle, as it is technically called, *quia timet;* that is, for fear that such agreements, securities, deeds or other instruments may be vexatiously or injuriously used against him, when the evidence to impeach them may be lost; or that they may throw a cloud or suspicion over his title or interest. " If an instrument ought not to be used or enforced, it is against conscience for the party holding it to retain it; since he can only retain it for some sinister purpose. If it is a deed, purporting *to convey lands* or other hereditaments, its existence in an uncanceled state necessarily has a tendency to throw a cloud over the title." This jurisdiction, continues the same learned author, is not confined to cases, where the instrument having been executed, is void upon grounds of law and equity—" it is applied even in cases of forged instruments, which may be decreed to be given up, without any prior trial at law on the point of forgery." The old course used to be, if the validity of the instrument was contested, to direct an issue or a trial at law to ascertain the fact: but this, though the common practice was a matter in the sound discretion of the court; as the determination of a jury upon the point was not indispensable. At present, a more convenient course, it is said, seems to prevail, for the court itself to decide the point, without sending the matter to be ascertained at law by a jury; unless the contradictory character of the evidence, or the want of clearness in the proofs make it advisable to direct an issue. [2 Story's Eq.

4–13.] The same author remarks, that where the illegality of the deed or other instrument appears upon the face of it, so that its nullity can admit of no doubt, the same reason for the interference of courts of equity to direct it to be canceled or delivered up, would not seem to apply; for in such case lapse of time cannot deprive the party of his full defence; nor can such a paper throw a cloud over his title, or diminish its security; nor can it be used as a means of vexatious litigation, or serious injury. [Id. 11.]

By a comparison of the allegations of the bill with the law as we have stated it, we think it perfectly clear, that the bill states a case proper for equitable interposition. True, it does not charge the defendant, Lyon, with the actual commission of waste, but it affirms, that trespasses and waste are threatened, that preparations are being made for their commission, and that by the acts of Lyon, and others acting avowedly under his authority, the complainants are disturbed and are likely to be still more seriously interrupted in the enjoyment of their property. That the acts charged to have been committed and threatened would most probably produce such a result as the complainants apprehend, we think cannot be seriously questioned. This being the case, and Lyon being insolvent, the preventive interference of chancery may be sustained upon the ground that the injury to the complainants' property would be otherwise irreparable. To authorize an injunction to issue in such case, it is not necessary that the acts threatened should have been committed— if the party insists upon his right to do them, and especially if he makes advances towards their commission, it is quite sufficient. [2 Atk. R. 183; Casey v. Holmes, Bott & Earle, 10 Ala. Rep. 776.]

The validity of the deed from Huggins as collector of the taxes for Mobile county, has not been drawn in question, for any defects apparent on its face, and it may therefore be conceded, that it is *prima facie* valid, if its recitals are sustained. Upon this hypothesis it may be assumed, that if it is not sufficient to divest the complainants' interest in the property in question, it at least throws a cloud over their title—is calculated to impair the market value of the estate, and will prevent a sale at its fair value. Under such circumstances, no

prudent man would be inclined to purchase. The bill alledpes that complainants are in possession, and upon an objection of the want of equity, this allegation must be taken to be true. This being the case, the defendants cannot maintain an action at law to test the validity of the title of Lyon, and the citations we have made, very satisfactorily establish the jurisdiction of a court of chancery to remove the cloud, and cancel his deed. [*Bacon v. Conn*, 1 S. & Marsh. Ch. R. 348.]

We are now brought to consider the validity of the sale under which Lyon claims, and the deed consequent thereon. By the act of 1815, in connection with that of 1821, it is enacted, that all lists of taxes shall be considered as having the force and effect of an execution; and it shall be lawful for all assessors and collectors of taxes, from and after the first day of September, in each year, to proceed to make distress and sale of the goods and chattels, lands and tenements of all persons in arrear for taxes. Where the delinquent has no goods and chattels within the county, then his lands and tenements within the same, or so much thereof as will be sufficient to pay the amount of taxes due from him, together with costs and charges, may be sold by the collector; "*Provided*, that the collector shall have given in the nearest newspaper published in this state, in the case of residents within the same, at least three months notice, and in the case of non-residents, at least six months notice of the time and place of sale." "Which notice shall contain a particular description of the land for sale; on what water course it is, and by what lands the same is bounded; and to whom the same was granted, or by whom the same is now owned or claimed." "There shall not be sold in one lot, more than three hundred and twenty acres of land; but if one lot shall not sell for the amount of taxes due from the delinquent, together with all costs and charges that shall have accrued thereon, the collector shall sell as many lots, or parts of lots, as shall raise the full amount due; in no case shall the collector sell any more land than shall be sufficient to raise such sum as shall be due.

The same statute directs that every collector of taxes who shall sell any real estate to satisfy any tax imposed by law-

ful authority, shall execute to the purchaser thereof, a deed
of conveyance immediately; "which deed shall be good and
effectual, both in law and equity," and shall recite, "that the
real estate thereby conveyed was sold for taxes, and the con-
sideration;" but such deed, though it may be proved, shall
not be recorded, until the expiration of one year from its
date; within which time the person whose estate has been
sold, may redeem the same.    [Clay's Dig. 566-7, § 50, 53.]
It is provided by the act of 1821, that "the assessor shall de-
liver to each individual whose property he assesses, a con-
cise statement of the property assessed, and the amount;
which he shall date and sign." [Id. 554, § 36.]    The act
of 1827, makes it the duty of the assessor to value town pro-
perty in case of the neglect or refusal of the proprietor to list
the same, and of the collector to collect the amount of tax
due thereon, in the same manner as if the tax had been giv-
en in by the owner.    It is also provided by the same statute,
"that the collectors of taxes in the several counties shall,
at the time, and in the manner prescribed by law, make dis-
tress and sale of the goods and chattels, lands and tenements
of all delinquents in making returns of taxable property, or
in payment of taxes."    In cases of taxes assessed, as direct-
ed by the act, on lands or town lots, to which a complete ti-
tle has not been made, (if no other property can be found to
satisfy it,) the collector is directed to offer the same for rent,
having first given thirty days notice, by advertisement at
the court house door, and at two other places in the county.
[See the act, § 3, 9, 12 ; Clay's Dig. 564, § 38; ·567, § 55.]
This enactment does not modify the act of 1815, as it res-
pects the proceedings essential to the sale of real estate for
the sale of taxes.    The ninth section, except so far as it is
declaratory of the act of 1815, relates expressly to lands or
town lots "sold under the authority of the United States,
previous to the first day of September, 1819." This is con-
clusively indicated, not only by the section referred to, but
by the eighth and eleventh sections, and upon this hypothe-
sis we will consider the case.

In Williams v. Peyton's lessee, 4 Wheat. Rep. 77, it was
said that the authority conferred upon a collector to sell lands
for the non-payment of the direct tax, "is a naked power,

not coupled with an interest; and in all such cases, the law requires, that every pre-requisite to the exercise of that power, must precede its exercise; that the agent must pursue the power, or his act will not be sustained by it." 'The deed of the collector is not even *prima facie* evidence, that the pre-requisites prescribed by law have been complied with; but the party claiming under it must show positively, that they have been complied with.

It is easy for the purchaser, said the court, to show that the collector has posted up the notifications as required by the statute, but very difficult to show that he has not. He may readily prove that a personal demand was made on the person liable for the tax, "but the negative in many cases would not admit of proof. No greater hardship is imposed on the purchaser to require him to prove the publication in a gazette, than to require him to prove that a naked power of attorney, in a case in which his deed has been executed by an attorney, was really given by the principal. "But to require from the original proprietor proof that these acts were not performed by the collector, would be to impose on him a task always difficult, and sometimes impossible to be performed." [See also, 4 Cranch's Rep. 403; 9 Id. 64; 1 Scam. R. 335; 1 Bibb's R. 295; 5 Mass. Rep. 403; 4 Dev. & Bat. R. 363.] A purchaseer of lands which have been sold for the non-payment of taxes cannot defend his possesion by the production of the collector's deed, and proof of its execution, but he must also show that the lands were listed; that taxes were due and unpaid, and that the lands were regularly advertised for sale. "In deciding on tax titles, great strictness has always been observed, and less latitude given than in proceedings on judgment and execution. A collector who sells lands for taxes, must act in conformity with the law from which he derives his power, and the purchaser is bound to inquire whether he has done so, or not. He buys at his peril, and cannot sustain his title, without showing the authority of the collector, and the regularity of the proceedings. In these cases the maxim *caveat emptor* applies." [3 Ohio Rep. 232; see also, 2 Ohio, 378; 3 Yeates' Rep. 284; 2 Id. 100; 13 Sergt. & R. Rep. 208; 4 Dev. & Bat. Rep. 386; 5 Wheat.

Rep. 116 ; 6 Id. 119 ; 1 Yeates' Rep. 300 ; 3 Monr. Rep. 271.]

In an *ex parte* proceeding, as a sale of land for taxes, under a special authority, great strictness is required. To divest an individual of his property against his consent, every substantial requisite of the law must be complied with. No presumption can be raised in behalf of a collector who sells real estate for taxes, to cure any radical defect in his proceedings ; and the proof of regularity devolves upon the person who claims under the collector's sale. [4 Pet. R. 349.] To the same effect is Avery v. Rose, 4 Dev. Rep. 549, in which it was also held, that the collector's deed must be made at the time directed by the statute. In the Lessee of Watt v. Gilmore, 2 Yeates' Rep. 330, lands were assessed and sold for the non-payment of taxes, as the property of A. G. and J. G., but were advertised as the property of C. G. and company: *Held*, that the variance between the advertisement, assessment and deed, was fatal to the sale and operation of the deed. So it has been decided, that under the eighth section of the act of 1812, to amend the act for the incorporation of the city of Washington, a sale of unimproved squares, or lots in the city, for the payment of taxes is illegal, unless such squares and lots have been assessed to the true and lawful proprietor thereof ; and the advertisement of sale must contain a particular statement of the amount of taxes due on each lot separately. [8 Wheat. Rep. 681.] And if land is assessed in the name of A. when in fact it belonged to B., a sale for the non-payment of taxes will not, though a deed has been executed, and legal forms have in other respects been adhered to, convey a title to the purchaser. [1 Bibb's Rep. 295.] In fact it is indispensable to the regularity of a sale, in such case, that the assessment of the tax should have been made strictly in conformity to law. [1 Tyler's Rep. 305 ; 14 Mass. Rep. 177 ; 1 Pick. Rep. 482.] Where the statute requires the notice shall be given to the occupant, or proprietor of the land, previous to the sale for the non-payment of the tax, unless such notice is given, the deed of the collector passes no title to the purchaser. [7 Wend. R. 148 ; 15 Id. 348 ; 16 Id. 550.]

If land is sold for the non-payment of divers taxes, one of which is illegal, and the rest legal, the sale is void *in toto* [1 Greenl. Rep. 339; see also, 15 Mass. Rep. 144.] So where a sheriff sells land for the taxes of two years, when he had a right to collect only those due for the last year, the sale is void, and his deed vests no title in the purchaser. [3 Dev. Rep. 432.] *And in Jones v. Gibson,* Taylor's N. C. Term Rep. 480, the sheriff sold an entire tract of land, for the payment of the taxes assessed thereon, although the taxes for one third of the tract had been paid by a person who claimed to be the proprietor of that portion of it, and it was held that the sale was void. So where a sale of land was made for taxes, after a legal tender to the collector, by a part owner, of all that was due, no title passed to the purchaser. [3 Hawks. Rep. 283.]

A statute of New York required a tax list to be made out, " containing the names of all the taxable inhabitants residing in the district at the time of making out the list, and the amount of tax payable by each inhabitant, set opposite his name ;" and further directed, that a warrant issue, which " shall command the collector to collect from every person in such tax list or rate bill named, the sum therein set opposite to his name." *Held,* that where a farm is owned, and actually possessed by the widow and heirs of a person deceased, the designation of such owners in a tax list, and warrant for the collection of the tax, as " the widow and heirs of A. B. deceased, is a sufficient compliance with the directions of the statute to justify the collector in executing the warrant. [10 Wend. Rep. 346.] And in the Lessee of Massie's Heirs v. Long and others, 1 and 2 Ohio Rep. 412, it was held that the assessment of a tax upon a " part of a lot, or one acre of a lot," without quantity or location, in the one case, or without location in the other, is too vague and indefinite to authorize a sale of any part, or in any place. It has been decided under the tax laws of Illinois, that a deed to the purchaser of land sold for taxes, must show that the land was sold for the taxes of a particular year, and if it is ambiguous in this respect, it cannot be explained by parol testimony. [1 Gilm. Rep. 26.]

The earlier legislation of Illinois, in respect to the sale of

lands for a default in the payment of taxes, seems to have been modified, so as to make the deed of the auditor, (the officer authorised to convey,) evidence of the regularity, and legality of the sale, until the contrary shall be made to appear. [1 Gilm. Rep. 631 ; see also, Id. 131.] And although by a statute of New York, it is declared, that where lands are sold in consequence of the non-payment of taxes, and a deed is regularly executed, such deed "shall be conclusive evidence that the sale was regular," it has been held, the conveyance may be defeated by proof of the fact, that the tax for which the land was sold, was paid before the sale. It was said, that " the statute declares that the conveyance shall vest an absolute estate in fee simple in the purchaser.; which it does not, if the tax had not been paid ; but if it has been paid, then no estate passes by the sale, for the statute intended to divest the title of the former owner, for non-payment of the tax, and for that only ; and it must be so construed." The purchaser buys subject to being defeated if the tax has been paid, and if his title is invalidated for that cause, he must look to the state for the relief which such a case requires.  [18 Johns. R. 441.]

We might, perhaps, have saved ourselves the labor of thus multiplying citations on this branch of the case, by merely referring to a decision of our own, in which it was held, that to sustain a sale of real estate for the non-payment of taxes by the marshall and collector of the city of Wetumpka, the purchaser must show that every pre-requisite to the regularity of such sale had been strictly complied with.  [5 Ala. R. 433.]   But as the opinion, in that case, though clearly and satisfactorily reasoned, did not go into an elaborate examination of the question, we have thought altogether proper on the present occasion, to fortify the conclusion there expressed. It is important to the State, as well as to individuals, that the law upon this point should be understood, and this must be our apology for having thus extended this opinion.

Our statutes do not declare that a sale and conveyance, such as we are considering, shall operate *proprio vigore*, it merely provides that the collector's "deed shall be good and effectual, both in law and equity."   By this we understand, that it shall pass the title to the vendee, if the sale was made

in obedience to the directions of the law, and was authoris-
ed by it—not that the vendee shall be released from the *onus*
of proving every pre-requisite to the regularity of the sale.
This being the case, the citations from 4 Wheaton's Reports,
3 Ohio Reports, and others of a kindred character, are direct-
ly in point.    By these we have seen, that a tax collector's
deed is not even *prima facie* evidence in favor of the pur-
chaser's title, but must be sustained by proof of extraneous
facts.

The notice we have taken of our statutes, and the adjudi-
cations upon kindred enactments elsewhere, very clearly in-
dicate that the proceedings of the collector, Huggins, under
whose deed Lyon claims, were eminently irregular.    The
assessment does not particularize the land, by stating what
portion of the Orange Grove tract was assessed.    It could not
have been ascertained, (if at all,) without reference to deeds
and writings, as well as oral testimony, to which access could
most probably be obtained only by time and industry.    It
does not appear whether the assessment was made in the or-
dinary mode by the proprietors of the estate, or by the collec-
tor, upon his neglect or refusal to give it in ; nor is it shown
that the collector delivered to the proper persons a written
statement of the tax assessed.    It may be well questioned,
whether it is proved that the persons liable to pay the tax
had not sufficient property in Mobile county that could be
sold for its satisfaction.    Is it certain that the lands were as-
sessed to the proper persons ?    It is obvious from the proof,
that the greater part of the sum assessed was paid by the real
proprietors of the property, or their agents, even previous to
its having been advertised for sale.

Again :  The advertisement by the collector of the time and
place of sale, is as general as the assessment, and proposed
to sell " the balace of the Orange Grove tract remaining un-
sold," to pay the entire sum assessed, without noticing the
payment of any part of it; nor can the land to which it re-
fers be identified, and located, otherwise than by reference to
extraneous written, and perhaps verbal evidence.    And to
this it may be added, that it not only does not appear that
the sale was advertised for three months, but it was proved

by the positive testimony of one witness, that the advertisement first appeared on the 7th of January, 1842, and the sale was made on the 7th of February next thereafter—being thirty days. It is unnecessary to inquire whether any particular in which we have noticed the proof to be wanting, constitute so many legal objections to the title of the defendant, Lyon, since it is perfectly clear from the terms of the statute, that the two last stated are substantial defects in the advertisement, and are fatal to his pretensions. The affirmation in the answers of Lyon and Huggins, that the sale was advertised *according to law*, are too general and indefinite to entitle them to be considered a direct denial of the allegation, that the notice of the sale was published for thirty days only. These defendants do not state what they consider a legal advertisement—it may be, they consider such as was published, and for the period proved, was a compliance with the statute. Be this as it may, upon principles of reason and analogy, the opinion of a defendant generally expressed, that a matter was transacted pursuant to the law, cannot outweigh the positive declarations of a witness, who states the facts specially, which show that the law was disregarded.

We need not consider any other question discussed in this case, as the result cannot be changed by any conclusion we might attain in respect to them. The consequence is, that the chanceller rightly perpetuated the injunction, and set aside the sale and conveyance upon which the defendant, Lyon, rested his claim—the decree is therefore affirmed.